IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

GENESSE MCKELDIN            *
                                    *
         v.                     *     Civil No. JFM-05-2563
                                    *
RELIANCE STANDARD LIFE INSURANCE *
COMPANY                      *
                                    *
                               *****

MEMORANDUM

Plaintiff Geneese M. McKeldin ("McKeldin") has brought this action against defendant

Reliance Standard Life Insurance Co. ("Reliance") claiming wrongful denial of disability benefits

in violation of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001

*et seq.* Now pending before the court are the parties' cross-motions for summary judgment. For the

reasons that follow, McKeldin's motion is denied and Reliance's motion is granted.[1]

I.

A.

McKeldin began working in 1988 as a registered nurse and nurse manager in the office of

Dr. Marc L. Chaiken. (Compl ¶¶ 1, 8; Reliance Br. at 1.) As a benefit of her employment she

participated in a group disability plan ("Plan") governed by ERISA and issued by Reliance. (Compl.

¶ 9.)

---

[1] Also pending before the court is McKeldin's motion to take discovery, which I am also denying. As discussed below, *infra* Section II, Reliance had discretionary authority to determine whether McKeldin was entitled to disability benefits. Because review of Reliance's decision is therefore limited to the administrative record Reliance had before it, which the insurer has provided to the court, "discovery would be entirely unnecessary." *Briggs v. Marriott Int'l, Inc.*, 368 F. Supp. 2d 461, 467 n.4 (D. Md. 2005) (citing *Sheppard & Enoch Pratt Hosp. v. Travelers Ins. Co.*, 32 F.3d 120, 125 (4th Cir. 1994)).

On January 4, 2001, McKeldin was hospitalized for treatment of deep vein thrombosis ("DVT") in her left calf muscle. (Reliance Br. at 1.) She did not return to work during the next three months. On April 3, 2001, she submitted an application to receive long-term disability benefits under the Plan's "total disability" provision, claiming she was incapable of working due to DVT, as well as fibromyalgia and chronic fatigue. (Administrative Record ("A.R.") at 287, Exhibit A to Reliance Br.) The Plan defines "total disability" to mean that, "as a result of an injury or sickness,"

(1) during the Elimination Period, an Insured cannot perform each and every material duty of his/her regular occupation; and

(2) for the first 36 months for which a Monthly Benefit is payable, an Insured cannot perform the material duties of his/her regular occupation;

    a. "Partially Disabled" and "Partial Disability" mean that as a result of an Injury or Sickness an Insured is capable of performing the material duties of his/her regular occupation on a part-time basis or some of the material duties on a full-time basis. An Insured who is Partially Disabled will be considered Totally Disabled, except during the Elimination Period; and

(3) after a Monthly Benefit has been paid for 36 months, an Insured cannot perform each and every material duty of any occupation. Any occupation is one that the Insured's education, training or experience will reasonably allow.

(Plan Documents at 2.1, Exhibit B to Reliance Br.) Reliance approved McKeldin's application and began paying her benefits on April 5, 2001.

Around this time, McKeldin also applied for disability benefits from the Social Security Administration based on the same conditions she included in her application to Reliance. In a letter dated November 2, 2001, the agency denied her request, stating in relevant part:

We have determined that your condition does not keep you from working. . . . Although you may experience discomfort, the evidence shows you are still able to move about and to use your arms, hands and legs in a satisfactory manner. You are able to walk, stand and move about without help and you can use your arms and hands for basic grasping and handling. Although you have a history of a sleep disorder, this condition has not caused you severe complications. Although you are depressed at times, evidence shows you are able to think, communicate, act in your own interest and care for your own needs. Also, you can get along with others, do your usual daily activities and remember and follow basic instructions. Based on your description of the job you performed as a nurse manager, we have concluded that you have the ability to return to this type of job.

(A.R. at 336.) Nothing in the record indicates that McKeldin appealed this decision.

2

A year later on October 8, 2002, Reliance required McKeldin to meet with psychiatrist Robert Frieman for an independent psychiatric examination. (Reliance Br. at 4-5.) In the report he generated from that meeting, Dr. Frieman briefly summarized McKeldin's treatment history. From this, Dr. Frieman stated that McKeldin's "description of her syndrome sounds consistent with a chronic pain syndrome or possibly fibromyalgia." (*Id.* at 724.)

After conducting his own examination, Dr. Frieman noted that McKeldin did appear depressed and that she claimed could not work full time. (*Id.* at 723, 725.) However, she also told him that she had been working anywhere between four and twenty hours a week at Howard County General Hospital, but could do no more because of her pain. (*Id.* at 724.) After describing the activities McKeldin was able to perform outside of work, *e.g.*, driving, dressing and bathing herself, doing a little of the cooking and cleaning, he noted that she "gets along with other people 'fine,' and that she has problems with concentration when she is exhausted." (*Id.* at 724-25.) He concluded by stating first that "[m]ost of her problems result from her depression, her tiredness, her insomnia and her pain secondary to the Fibromyalgia. I feel it is important that she get Individual Psychotherapy with a Psychiatrist with whom she feels she can work and that she goes to at least once a week." (*Id.* at 725.) He then added that, in his view, "she can work part time and she is gradually improving, but that it will take her at least months to get where she can work full time." (*Id.*)

Based on Dr. Frieman's report, Reliance communicated to McKeldin its belief that her disability benefits were limited by a mental/nervous disorder exception in the Plan. The exception states that:

> Monthly Benefits for Total Disability caused by or contributed to by mental or nervous disorders or
> drug or alcohol addiction will not be payable beyond an aggregate lifetime maximum duration of

twenty-four (24) months unless the Insured is in a Hospital or Institution at the end of the twenty-four (24) month period.

(Plan Documents at 10.0.) Such disorders include "(1) bipolar disorders (manic depressive syndrome; (2) schizophrenia; (3) delusional (paranoid) disorders; (4) psychotic disorders; (5) depressive disorders; (6) anxiety disorders; (7) somatoform disorders (psychosomatic illness); (8) eating disorders; or (9) mental illness." (*Id*.) Consistent with the exception, Reliance continued to pay McKeldin her monthly benefits. Prior to the end of the two-year period for which payments were due, McKeldin asked Reliance to reconsider its position. (Reliance Br. at 5.) Reliance did reconsider, and on July 2, 2003 it informed her that it was adhering to its conclusion that her "disability [was] due to psychological conditions . . . ." (A.R. at 102.)

B.

McKeldin appealed this decision in September 2003, claiming that her depression was a consequence of her fibromyalgia, not a cause, and that it was only the pain that was preventing her from working. (*Id*. at 10, 78-84.) She attached to her appeal a letter from Dr. Bacharach, who stated that McKeldin's "depression is clearly secondary to the effects of the fibromyalgia." (*Id*. at 86.) He added that her "[s]ymptoms of depression significantly overlap with those of the fibromyalgia and include lethargy, down mood, decreased motivation and energy, sleep disturbance, and difficulty concentrating." (*Id*. at 85.) Finally, he concluded that her "ability to work is limited by her fibromyalgia and its sequelae. Despite her partial positive response to medications, symptoms of the fibromyalgia persist and limit her functioning." (*Id*. at 86.)

McKeldin also included an affidavit of her own in the appeal. In it she spoke about the onset of her fibromyalgia and the devastating impact it had upon her life. (*Id*. at 87-94.) To provide an

4

example of the pain and discomfort she experiences daily, she recounted an episode that occurred in the spring of 2001. While walking down a street she became dizzy and collapsed, placing her arms in front of her to brace for the fall. For weeks afterward she experienced pain in one wrist, but was unable to differentiate it from the pain caused by her fibromyalgia and thus did not immediately pursue medical treatment. It was not until weeks later that she learned that her wrist was actually fractured. (*Id.*)

One of the consequences of her pain, McKeldin went on to add, was that she was unable to sleep, which caused her to become exhausted easily at work. (*Id*. at 87.) When her decreased mental alertness compromised her ability to make emergency triage decisions, she began to realize the extent of her disability. (*Id*. at 87-88.) It was only reluctantly that she went on full-time leave in January 2001. (*Id*. at 87.) Despite this setback, McKeldin still believed she could contribute to the nursing profession. (*Id*. at 91.) Accordingly she began networking with coworkers, friends, and former employers, and eventually landed two part-time jobs. (*Id*. at 91-92.) The first was the job at Howard County General Hospital that Dr. Frieman had noted in his report, which required her to do such tasks as administer flu shots. (*Id*. at 92.) The other job was as a forensic nurse performing sexual assault examinations at the same hospital, which required her to be on-call only a few days a month. (*Id*. at 91-92.) In order to obtain this latter position McKeldin had to attend several training classes. (*Id*. at 91.) For both jobs, McKeldin said she could only work 3- to 4-hour shifts at a time, and that each shift would require her to recuperate for between 18 to 36 hours. (*Id*. at 92.)

In response to McKeldin's appeal, Reliance requested a peer review of the available evidence by Dr. William Hauptman. (*Id*. at 626.) In his report, which he completed in December 2003, Dr. Hauptman recounted at length McKeldin's medical history. (*Id*. at 627-38.) Without having met

personally with McKeldin or spoken with her treating physicians, he then stated his opinion that her psychological problems were not the exclusive result of her fibromyalgia, and cited specifically the sentence in Dr. Frieman's report in which he stated "[m]ost of her problems result from her depression, her tiredness, her insomnia and her pain secondary to the Fibromyalgia." (*Id*. at 638.) Dr. Hauptman interpreted the word "secondary" as applying only to the word "pain," saying "I do not believe [Dr. Frieman] is relating the preceding diagnoses of depression, fatigue and insomnia as secondary to fibromyalgia." (*Id*.)

Dr. Hauptman also stated his opinion that the medical records did not support McKeldin's claim that she was totally disabled, whether from her pain or depression or a combination of the two. (*Id*.) Based on the following five pieces of evidence, he concluded that she was capable of full time sedentary and light level work: (1) she had worked with the reported symptoms and complaints prior to claiming disability; (2) there was no objective support for her alleged pain; (3) she was being treated with medication to address asthma and her psychiatric condition but not her alleged pain; (4) a side effect of her psychiatric medication was fatigue, which was one her alleged bases for disability; and (5) she was working two part-time jobs at the hospital and had also been taking online courses through the University of Maryland Medical Center in an effort to obtain a Bachelor of Arts in nursing. (*Id*. at 639-40; Reliance Br. at 6-7.)

In addition to Dr. Hauptman's peer review, in February 2005 Reliance also had McKeldin meet with a physical medicine and rehabilitation physician named Scott Brown for an independent medical examination. (A.R. at 463-79.) After conducting a musculoskeletal exam, Dr. Brown completed a physical capabilities questionnaire in which he reported that McKeldin was capable of working at a sedentary level because she could tolerate sitting frequently (34-66% of an 8-hour work

6

day) and standing, walking, bending, and climbing stairs occasionally (33% or less of an 8-hour work day). (*Id*. at 478.) He then diagnosed her with fibromyalgia and mild degenerative joint disease, stating that her "[p]rognostication is complex and affected by other elements of her presentation that include other functional pain disorders including irritable bowel syndrome and migraine, sleep disorder noted to be Alpha Delta wave sleep disorder, depression, [and] substantial psychological stressors . . . ." (*Id*. at 475.) He concluded by finding that there was "no medical contraindication to Ms. McKeldin performing activity at a sedentary level. She is essentially performing this level of activity now at home. Her complaints of exacerbation after brief exposure to the work environment at essentially sedentary level activity seem out of proportion to same level of activities performed in the home environment." (*Id*. at 476.)

## C.

Reliance wrote McKeldin on April 1, 2005 to inform her that her appeal was denied (*Id*. at 9-16.) It asserted two bases for its decision: (1) that the mental/nervous disorder exception applied, and (2) that McKeldin did not qualify as "totally disabled." In explaining its conclusion with respect to the mental/nervous disorder exception, Reliance went through McKeldin's medical history in depth, and also discussed the findings of Drs. Hauptman and Brown. (*Id*. at 9-14.)

As for its conclusion that McKeldin was not "totally disabled," Reliance began by citing the third subparagraph from the Plan's definition of the term: "after a Monthly Benefit has been paid for 36 months, an Insured cannot perform each and every material duty of any occupation. Any occupation is one that the Insured's education, training or experience will reasonably allow." (*Id*. at 15.) Noting that it had paid monthly benefits to McKeldin from April 5, 2001 until November 5, 2004, Reliance stated that after reviewing all of her medical files, and because she had "been

7

performing *some* of the material duties of part-time employment[,] she would not qualify for [long-term disability] benefits beyond 36 months." (*Id* (emphasis in original).) It further stated that its conclusion was buttressed by the findings of a staff Vocational Expert who had conducted a Residual Employability Analysis. Taking into consideration McKeldin's restrictions and limitations as described by Dr. Brown, as well as her work experience as a registered nurse and office nurse, the expert had determined that she was capable of performing some of the material duties of the following occupations (as described by the Department of Labor's Dictionary of Occupational Titles): Hospital Admitting Clerk, Holter Scanning Technician, Optometric Assistant, Tumor Registrar, and Rehabilitation Clerk. (A.R. at 15-16.) The expert also determined that McKeldin was capable of performing all of the material duties of a Cardiac Monitor Technician. (*Id*. at 16.)

McKeldin's administrative remedies are now exhausted and she filed this action on September 15, 2005. Reliance answered the complaint two weeks later, and then filed for summary judgment in December. McKeldin responded with a cross-motion for summary judgment.

## II.

Summary judgment shall be granted if "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed R. Civ. P. 56(c). It is well settled that a court reviewing a denial of benefits under ERISA is to apply a *de novo* standard of review unless the benefit plan grants discretionary authority to the administrator or fiduciary to determine benefits eligibility or interpret the terms of the plan. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111, 115 (1989); *Ellis v. Metropolitan Life Insurance Co.*, 126 F.3d 228, 232 (4th Cir. 1997). If the plan confers such discretionary authority, a court may only review denial decisions for abuse of discretion. *Bruch*, 489 U.S. at 111. Under this deferential standard, the administrator or

fiduciary's determination will not be overturned if it is reasonable, even if the court would have concluded differently. *Ellis*, 126 F.3d at 232; *Brogan v. Holland*, 105 F.3d 158, 161 (4th Cir. 1997). A decision must be deemed reasonable if it is "the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." *Brogan,* 105 F.3d at 161 (quoting *Bernstein v. CapitalCare, Inc.*, 70 F.3d 783, 788 (4th Cir. 1995)); *see also Booth v. Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan*, 201 F.3d 335, 342-43 (4th Cir. 2000) (laying out various factors a court can consider when evaluating the reasonableness of an ERISA benefits decision).

In the instant case, the Plan documents expressly designate Reliance "as the claims review fiduciary with respect to the insurance policy and the Plan," meaning it "has the discretionary authority to interpret the Plan and the insurance policy and to determine eligibility for benefits." (Plan Documents at 5.0, Exhibit B to Reliance Br.) Thus, the abuse of discretion standard applies.[2]

As Reliance acknowledges, however, a "modified" abuse of discretion standard applies because of the potential conflict of interest arising from Reliance's dual role as decision-maker and insurer. *See Laser v. Provident Life & Accident Ins. Co.*, 211 F. Supp. 2d 645, 649 (D. Md. 2002); *Bernstein*, 70 F.3d at 787-88; *Bedrick v. Travelers Ins. Co.*, 93 F.3d 149, 152 (4th Cir. 1996). Under this standard, although a reviewing court will accord some deference to the administrator's discretionary decision, "this deference will be lessened to the degree necessary to neutralize any

---

[2] In *Gallagher v. Reliance Standard Life Ins. Co.*, 305 F.3d 264 (4th Cir. 2002), the Fourth Circuit held that Reliance did not have discretionary authority under a long-term disability plan to determine a claimant's eligibility for benefits. Directing its attention only to language in the plan that stated "[Reliance] will pay a Monthly Benefit if the Insured . . . submits satisfactory proof of Total Disability to us," the court stated that the plan did not clearly grant discretion to the insurer because it was ambiguous as to whether the proof had to be objectively or subjectively satisfactory. *Id.* at 269-70. The same language appears in the Plan at issue here. (Plan Documents at 8.0.) However, because of the language quoted above in the text, which apparently was not included in the plan at issue in *Gallagher*, McKeldin does not argue that Reliance lacks discretionary authority.

untoward influence resulting from the conflict." *Doe v. Group Hospitalization & Medical Services*, 3 F.3d 80, 87 (4th Cir. 1993). A court must review the merits of the administrator's decision to determine whether it is consistent with an exercise of discretion by an administrator operating without any conflicts of interest. *Bedrick*, 93 F.3d at 152 (citing *Bailey v. Blue Cross & Blue Shield of Virginia*, 67 F.3d 53, 56 (4th Cir. 1995). Furthermore, in considering the conflict of interest as a factor in the reasonableness inquiry, the court is to determine whether the administrator abused its discretion based on a "sliding-scale" review, which essentially focuses on whether plaintiff received a full and fair review. *Willis v. Baxter Intern., Inc.*, 175 F. Supp. 2d 819, 831 (W.D.N.C. 2001). Under this "sliding-scale" analysis, "[t]he more incentive for the administrator or fiduciary to benefit itself by a certain interpretation of benefit eligibility or other plan terms, the more objectively reasonable the administrator or fiduciary's decision must be and the more substantial the evidence must be to support it." *Ellis*, 126 F.3d at 233.

As discussed above, Reliance has asserted two independent bases for its decision to deny McKeldin's benefits claim: that despite her disability she is capable of performing some of the material duties of other suitable occupations, and that mental disorders have contributed to her disability. (A.R. at 9-16.) A finding in favor of Reliance on either is sufficient to grant its motion. Because I conclude that the company did not abuse its discretion with respect to the former basis, there is no need to address the latter.

III.

Review of Reliance's decision must begin with the terms of the Plan. McKeldin is entitled to long-term disability benefits only if she is "totally disabled," a condition the Plan defines as follows:

10

"Totally disabled and "Total Disability mean, that as a result of an Injury or Sickness:

(1)   during the Elimination Period, an Insured cannot perform each and every material duty of his/her regular occupation; and

(2)   for the first 36 months for which a Monthly Benefit is payable, an Insured cannot perform the material duties of his/her regular occupation;

    a.   "Partially Disabled" and "Partial Disability" mean that as a result of an Injury or Sickness an Insured is capable of performing the material duties of his/her regular occupation on a part-time basis or some of the material duties on a full-time basis. An Insured who is Partially Disabled will be considered Totally Disabled, except during the Elimination Period; and

(3)   after a Monthly Benefit has been paid for 36 months, an Insured cannot perform each and every material duty of any occupation. Any occupation is one that the Insured's education, training or experience will reasonably allow.

(Plan Documents at 2.1.) Because Reliance paid McKeldin a monthly benefit for the first 36 months of her disability, at issue is the definition in subparagraph three. (A.R. at 15.)

A.

Read in isolation, the phrase "each and every" creates an ambiguity in the definition that renders it susceptible to two interpretations. To illustrate, assume a suitable occupation comprised of seven material duties. Under one interpretation, an insured would be considered totally disabled only if she was unable to perform all seven material duties. In other words, the insured's ability to perform even one such duty would disqualify her from receiving benefits. Under the competing interpretation, an insured would be eligible for benefits if she was able to perform up to six of the material duties, but not the seventh and final duty.

McKeldin argues that since Reliance drafted the insurance contract the court must resolve the ambiguity in her favor by adopting the latter interpretation. *Bynum v. Cigna Healthcare of North Carolina, Inc.*, 287 F.3d 305, 313-14 (4th Cir. 2002). I decline to do so, however, because the ambiguity disappears when subparagraph three is read in conjunction with the other definitions of "totally disabled" in the two preceding subparagraphs. When so read, it becomes unmistakably clear that the former interpretation is what was intended.

11

Looking to subparagraph one, the definition of "total disability" for the Elimination Period also contains the phrase "each and every." Both the Fourth and Sixth Circuits have interpreted this exact same language in other Reliance insurance contracts to mean that an insured is entitled to benefits during this period only if she can establish that she is unable to perform *all* of her occupation's material duties. *Gallagher*, 305 F.3d at 275 ("Because Gallagher could perform *certain occupational duties* prior to [the date he resigned] and has not presented evidence demonstrating that his condition became more severe on or after [that date], we conclude that Gallagher has not submitted objectively satisfactory evidence that he was unable to perform *each and every* material duty of his occupation during the elimination period.") (emphasis added); *Carr v. Reliance Standard Life Ins. Co.*, 363 F.3d 604, 607 (6th Cir. 2004) ("The plan plainly limits finding 'Total Disability' to a claimant who 'cannot perform each and every material duty of his/her regular occupation' during the Elimination Period. If a claimant can perform even one material duty of his regular occupation during [this time], he is not totally disabled.") (citing *Gallagher*, 305 F.3d at 275).

The source of this interpretation derives from the definition of "partial disability" in subparagraph two, which states that an insured is considered "partially disabled" if she "is capable of performing . . . *some* of the material duties [of her regular occupation] on a full-time basis." (Plan Documents 2.1 (emphasis added).) While partial disability is sufficient to establish eligibility for receipt of total disability benefits during the 36-month period, it does not suffice to qualify an insured as "totally disabled" as defined in subparagraph one for the Elimination Period. Thus, *a fortiori*, the phrase "each and every," at least as used in subparagraph one, must mean that an insured who can perform one or more of the material duties of her job, but not all, is not "totally disabled." *See Island Creek Coal Co. v. Lake Shore, Inc.*, 832 F.2d 274, 277 (4th Cir. 1987) ("[I]n construing

language in a contract, 'an interpretation that gives a reasonable meaning to all parts of the contract will be preferred to one that leaves portions of the contract meaningless.'") (quoting *United States v. Johnson Controls, Inc.*, 713 F.2d 1541, 1555 (Fed. Cir. 1983)).

Because "[i]t is logical to assume that the words were intended to convey the same meaning both times they were used," the court adopts the same interpretation of "each and every" for subparagraph three. *National Ropes v. National Diving Serv., Inc.*, 513 F.2d 53, 58 (5th Cir. 1975). *Cf. Sullivan v. Stroop*, 496 U.S. 478, 484 (1990) (espousing "normal rule of statutory construction" that "identical words used in different parts of the same act are intended to have the same meaning").

## B.

McKeldin argues that this conclusion is inequitable and contrary to the expectations of a reasonable insured. She asserts that consciousness is a requisite of any occupation, and thus, with the exception of a claimant who is in a "persistent vegetative state," no insured could possibly qualify for benefits. According to her, this disconnect between reasonable expectations and the Plan's language is another basis for concluding that the phrase "each and every" as used in subparagraph three is ambiguous. I disagree.

As a factual matter, McKeldin has presented no evidence that any insurer, let alone Reliance, has gone so far as to delineate consciousness as a material duty of an occupation, the presence of which could justify the denial of disability benefits.[3] And as a legal matter, McKeldin's

---

[3] The Department of Labor's Dictionary of Occupational Titles ("DOT") reveals that job descriptions typically focus on the discrete tasks an employee will be called upon to perform, as opposed to simply being conscious or able to breathe. For example, a farmhand that works with grain must be able to "Drive[] and operate[] farm machinery to plant, cultivate, harvest, and store grain crops, such as wheat, oats, rye, and corn: Attach[] farm implements, such as plow, disc, and drill, to tractor and drives tractor in fields to till soil and plant and cultivate grain, according to instructions." Department of Labor, DOT § 401.683-010, *available at* http://www.oalj.dol.gov/libdot.htm. And the duties of a tax-preparer include: "Review[ing] financial records, such as prior tax return forms, income statements, and documentation

dissatisfaction with Reliance being able to deny her claim even if she is able to perform only one material duty is not equivalent to ambiguity in the Plan's terms. Thus, I have no authority to permit McKeldin's preferred interpretation to trump the clear language of the Plan, see *Carr*, 363 F.3d at 607 n.3, or to ignore Fourth Circuit precedent directly on point, *Gallagher*, 305 F.3d at 275.

C.

McKeldin falls back on an estoppel theory. She states that she "[c]learly . . . was able to perform at least one material duty during the [E]limination [P]eriod," yet Reliance concluded that she was "totally disabled." She argues that the insurer cannot now reverse course and employ a stricter definition. This argument is flawed for the simple reason that the Fourth Circuit has held that principles of estoppel are inapplicable in an ERISA action. *White v. Provident Life & Accident Ins. Co.*, 114 F.3d 26, 29 (4th Cir. 1997).

IV.

The remaining question is whether Reliance abused its discretion in applying the Plan language to McKeldin's claim. A court will uphold a benefits decision if it is "the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." *Brogan,* 105 F.3d at 161 (quoting *Bernstein*, 70 F.3d at 788). Judicial review of Reliance's decision is limited to the body of evidence before the insurer at the time it rejected McKeldin's claim. *See Elliott v. Sara Lee Corp.*, 190 F.3d 601, 608-09 (4th Cir. 1999). It is McKeldin's burden to prove that she is entitled under the Plan to receive disability benefits. *Donnell v. Metro. Life Ins. Co.*, 2006 U.S. App. LEXIS 3073, at 16 n.9 (4th Cir. 2006) (citing *Ruttenberg v. U.S. Life Ins. Co.*, 413 F.3d 652, 663

---

of expenditures to determine forms needed to prepare return. Interview[ing] client to obtain additional information on taxable income and deductible expenses and allowances." *Id*. § 219.362-070.

(7th Cir. 2005), *Band v. Paul Revere Life Ins. Co.*, 14 Fed. Appx. 210, 212 (4th Cir. 2001) (per curiam), and *Gable v. Sweetheart Cup Co.*, 35 F.3d 851, 855 (4th Cir. 1994)). Thus, to succeed on her claim McKeldin must demonstrate that Reliance abused its discretion in concluding that she can perform at least one of the material duties of any occupation for which she is reasonably qualified to perform. She has not done so.

## A.

Reliance's decision to terminate McKeldin's benefits was the result of a process that, at least facially, compares favorably with those the Fourth Circuit has previously found to be acceptable. *See, e.g.*, *Donnell v. Metro. Life Ins. Co.*, 2006 U.S. App. LEXIS 3073, at *13-15; *Booth*, 201 F.3d at 344-45; *Ellis*, 126 F.3d at 233-34. Over the course of more than three years, the company considered all of the medical reports submitted by McKeldin's treating physicians, McKeldin's own affidavit attached to her appeal, the decision by the Social Security Administration denying her claim for benefits, two independent medical evaluations provided by Drs. Frieman and Brown, a peer review by Dr. Hauptman, and a job placement analysis by a staff Vocational Expert. Moreover, Reliance kept in contact with McKeldin throughout the course of the review process, notifying her of its decisions at each stage.

McKeldin, however, raises an objection to Reliance's partiality due to its reliance upon the peer review conducted by Dr. Hauptman.[4] She cites five recent opinions of other federal district courts that found that Dr. Hauptman had not engaged in a deliberate and reasoned evaluation of the medical evidence before him, and that called into question his integrity and credibility. *Bowman v.*

---

[4] McKeldin also raises an objection to the partiality of a nurse who Reliance had conduct a review of McKeldin's claim in 2003. The nurse's review was limited to determining whether the mental/nervous disorder exception applied, however, not whether McKeldin was capable of performing some of the material duties of a suitable occupation.

*Reliance Standard Life Ins. Co.*, 2003 WL 1524476, at *7 (N.D. Ill. March 31, 2003) ("Dr. Hauptman reported that plaintiff's claim was based solely on pain, despite the objective evidence of a disability in the medical record. He also seemed to rely on a medical assessment from 1998, when it is clear that plaintiff's condition was progressive and had deteriorated by 2000."); *Conrad v. Reliance Standard Life Ins. Co.*, 292 F. Supp. 2d 233, 238 (D. Mass. 2003) ("[T]he reports Dr. Hauptman generated betray a palpable bias in favor of rejecting the claim. Repeatedly, Dr. Hauptman's conclusions select for emphasis just one or two elements of a medical report, while ignoring additional facts and important context."); *Smetana v. Reliance Standard Life Ins. Co.*, 2003 WL 22594263, at *7 (Sept. 30, 2003) ("The conclusion reached by Dr. Hauptman is in direct conflict with the opinions of the Plaintiff's physicians and carry some level of bias."); *Omasta v. The Choices Benefit Plan*, 352 F. Supp. 2d 1201, 1209 (D. Utah 2004) ("Dr. Hauptman's opinion . . . is not reasonably based in the record. [His] review consists of discounting all of the substantial information supporting Plaintiff's claim of disability."); *Gunn v. Reliance Standard Life Ins. Co.*, 399 F. Supp. 2d 1095, 1102 n.5 (C.D. Cal. 2005) ("Reliance is the only insurance company for whom Dr. Hauptman works, and he derives approximately one-third of his income from his work with Reliance."); *Gunn*, 399 F. Supp. 2d at 1105 n.8 ("The Court notes, however, that there is some evidence in the record in this action that suggests that Dr. Hauptman is still willing to base his conclusions 'almost exclusively on the most optimistic data available.'") (quoting *Conrad*, 292 F. Supp. 2d at 238).

These decisions are indeed troubling, and McKeldin urges the court to respond to them by abandoning the abuse of discretion standard and applying a *de novo* standard in its stead. Reliance, however, cites to *Ellis*, in which the Fourth Circuit stated that when an insurer has discretionary

authority to interpret Plan documents and determine eligibility for benefits, the abuse of discretion standard applies as a matter of course. *Ellis*, 126 F.3d at 233. Rather than abandon this standard in the face of potential self-dealing, the Fourth Circuit instructed that courts are to modify the standard using the sliding scale approach. *Id*; *see supra* Section II.

I do not discount the gravity of my colleagues' concerns and findings about Dr. Hauptman. Ultimately, however, what is at issue is the decision of Reliance to deny McKeldin claim for disability benefits, not Dr. Hauptman's peer review. *See Abromitis v. Continental Cas. Co.*, 261 F. Supp. 2d 388, 390 (W.D.N.C. 2003) ("While Plaintiff argues and may well be correct that Dr. Pinder is neither truly "outside" nor "independent," she was not the decisionmaker in this case and it is not Dr. Pinder's decision that this Court is reviewing.") As discussed below, Reliance had multiple, credible sources other than Dr. Hauptman from which to evaluate McKeldin's claim. Because I find that these sources alone provided Reliance with substantial evidence to support its decision, the concerns about Dr. Hauptman's potential bias are, in the final analysis, beside the point.

B.

Putting Dr. Hauptman's peer review aside, the following evidence provided a proper and credible basis for Reliance's conclusion that McKeldin is not "totally disabled." Dr. Frieman stated in October 2002, after reviewing her medical history and after she reported that she had been working at Howard County General Hospital anywhere from 4 to 20 hour a week, that McKeldin was capable of working part time and that it would only take her a few months to get to the point where she could work full time. Over two years later in February 2005, Dr. Brown concluded that "[t]here is no medical contraindication to Ms. McKeldin's performing activity at a sedentary level. She is essentially performing this level of activity now at home." In between these two independent

17

medical evaluations, the Social Security Administration denied McKeldin's claim for disability benefits, telling her that: "[Y]ou can get along with others, do your usual daily activities and remember and follow basic instructions. Based on your description of the job you perform as a nurse manager, we have concluded that you have the ability to return to this type of job." Moreover, McKeldin submitted an affidavit with her appeal in September 2003 in which she talked about her continued, albeit diminished, ability to contribute to the nursing profession, which culminated in her taking on two part-time jobs. Finally, Reliance's Vocational Expert determined in 2005 that McKeldin could perform some of the material duties of various occupations that matched her education and training *e.g.*, Holter Scanning Technician and Optometric Assistant, and that she could perform all of the material duties of a Cardiac Monitor Technician.

Taken together, these professional opinions and McKeldin's affidavit more than qualify as "substantial evidence." *Donnell*, 2006 U.S. App. LEXIS 3073, at *15 ("Substantial evidence is the quantum and quality of relevant evidence that is more than a scintilla but less than a preponderance and that a 'reasoning mind would accept as sufficient to support a particular conclusion.'") (quoting *LeFebre v. Westinghouse Elec. Corp.*, 747 F.2d 197, 208 (4th Cir. 1984), overruled by implication on other grounds by *Nord*, 538 U.S. 822).

McKeldin presents no reason for the court to find otherwise. Although she argues vigorously about the proper interpretation of "totally disabled" and the credibility of Dr. Hauptman, she does not even attempt to refute the conclusion of Drs. Frieman and Brown, the Social Security Administration, and the Vocational Expert that she is capable of performing at least one of the material duties of a suitable occupation. I must therefore conclude that Reliance satisfied its obligations under the Plan and ERISA when it determined that McKeldin is not entitled to disability

benefits. Accordingly, Reliance's motion for summary judgment is granted and McKeldin's cross-motion for summary judgment is denied.

A separate order follows herewith.


Date: April 4, 2006                                  /s/

                                                     J. Frederick Motz
                                                     United States District Judge